989 So.2d 1001 (2007)
R.W. COLE et al.
v.
Bob RILEY, Governor of the State of Alabama, et al.
1050662.
Supreme Court of Alabama.
October 19, 2007.
Order Overruling Rehearing March 7, 2008.
*1002 Shannon L. Goessling and Katherine D. Jordan, Southeastern Legal Foundation, Inc., Atlanta, Georgia; and D.M. Samsil, Birmingham, for appellants.
Troy King, atty. gen., and Margaret L. Fleming, asst. atty. gen., for appellees.
Ted Pearson, Birmingham, for amicus curiae United States Business & Industrial Council, in support of the appellants.
William D. Coleman and Arden R. Pathak of Capell & Howard, P.C., Montgomery, for amicus curiae Montgomery Area Chamber of Commerce, in support of the appellees.
COBB, Chief Justice.
This appeal presents the issue whether the practice by the Alabama Department of Public Safety ("ADPS") of offering the written portion of driver's license examinations in multiple languages violates the Alabama Constitution. The appellants, R.W. Cole, J.P. Hendrick, Thomas F. Schenzel, Stuart Shipe, and Charles Van Brock (hereinafter referred to collectively as "Cole"), are all members of the nonprofit organization "ProEnglish" based in Arlington, Virginia. Cole sued Bob Riley, Governor of the State of Alabama, and W.M. Coppage, director of ADPS, in their official capacities (hereinafter referred to collectively as "Riley"), in the Montgomery Circuit Court after Sandoval v. Hagan, 197 F.3d 484 (11th Cir.1999), a decision of the United States Court of Appeals for the Eleventh Circuit holding that "English-only" driver's license tests violate the disparate-impact regulations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, was reversed by the United States Supreme Court on the grounds that Title VI did not create a private right of action for individual plaintiffs. Alexander v. Sandoval, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).[1] Cole argued to the Montgomery Circuit Court that because the United States Supreme Court had reversed the Eleventh Circuit's decision in Sandoval, the district court's determination in Sandoval that a policy of English-only driver's license testing violates Title VI has no precedential value. Cole argued that Alabama's current practice of offering the written portion of the driver's license test in languages other than English should cease because, he says, the practice violates Amendment No. 509, Alabama Constitution 1901, which was ratified by the voters of Alabama in 1990, and which is now codified as Art. I, § 36.01, Ala. Const. 1901(Off.Recomp.) ("Amendment No. 509"). Amendment No. 509, which establishes English as the official language of Alabama, provides:
"English is the official language of the state of Alabama. The legislature shall enforce this amendment by appropriate *1003 legislation. The legislature and officials of the state of Alabama shall take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced. The legislature shall make no law which diminishes or ignores the role of English as the common language of the state of Alabama.
"Any person who is a resident of or doing business in the state of Alabama shall have standing to sue the state of Alabama to enforce this amendment, and the courts of record of the state of Alabama shall have jurisdiction to hear cases brought to enforce this provision. The legislature may provide reasonable and appropriate limitations on the time and manner of suits brought under this amendment."
(Emphasis added.)
Riley filed a motion for a summary judgment on the grounds that Sandoval remains binding precedent in the Eleventh Circuit, which includes Alabama, because the United States Supreme Court's reversal was on a purely procedural ground; that federal law requires that states provide meaningful access to driver's license examinations for people with limited English proficiency; and that Amendment No. 509 does not require that written driver's license examinations be administered only in English.
In his response to Riley's summary-judgment motion, Cole stated:
"This is a very simple case involving two very straightforward questions of law namely, (a) whether the State's current policy of giving its driver's license exam in multiple languages violates Ala. Cons. Art. I, § 36.01, and (b) if so, whether the Alabama Constitution is overridden by federal law."
Cole made no evidentiary submissions to the trial court.
The trial court recognized Cole's failure to offer evidence indicating that English-only testing for driver's licenses is necessary to preserve and enhance English as the common language or that testing in multiple languages is leading to the erosion of English as the common language of the State of Alabama. The trial court entered a summary judgment for Riley; in its summary-judgment order the trial court stated, in pertinent part:
"The Court, therefore, need not decide what Title VI or its regulations require, nor whether they are valid. Rather, [Cole's] claim can be resolved by reference to Amendment 509 itself, which provides that `English is the official language of the state of Alabama.' This makes English Alabama's official languagenot its only language. Even the organization of which [Cole is] a part ProEnglishstates on its website that `Official English doesn't mean "English only."' (Defs.' Ex. 10.) Moreover, nowhere does Amendment 509 mandate English-only driver's license testing.
"[Cole has] submitted no evidence to establish that, as a factual matter, English-only driver's license testing is `necessary' to preserve and enhance the role of English as the State's common language. Nor [has he] proved the contrarythat multiple-language testing has, as a factual matter, led to the erosion of English as the State's common language."
Cole appealed.
Our standard of review for a summary judgment is settled:
"In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., *1004 531 So.2d 860, 862 (Ala.1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala.1997).
We summarize the facts as follows: the written examination for an Alabama driver's license was administered in multiple foreign languages from the 1970s to 1991. After the ratification of Amendment No. 509, ADPS implemented a policy of giving written driver's license examinations exclusively in English, and it withheld from those taking the tests access to any kind of foreign-language interpretative aids or translators. Accommodations for deaf, disabled, and illiterate applicants remained available.
In 1996, Martha Sandoval, on her own behalf and on behalf of those similarly situated, sued L.N. Hagan, then acting director of ADPS, in the United States District Court of the Middle District of Alabama, claiming that ADPS's policy of offering written driver's license tests exclusively in English violated the national-origin protections contained in Title VI of the Civil Rights Act of 1964. The district court ruled in favor of Sandoval. Sandoval v. Hagan, 7 F.Supp.2d 1234 (M.D.Ala. 1998). After the district court's decision in Sandoval, ADPS reinstated the practice of administering the written portion of the driver's license test in foreign languages. That practice continues to this date. Presently, ADPS offers the written portion of the driver's license test in 12 foreign languages, including Spanish, Vietnamese, Korean, Chinese, Japanese, French, Arabic, German, Russian, Thai, Farsi, and Greek.
Hagan appealed the district court's decision to the United States Court of Appeals for the Eleventh Circuit. That court upheld the lower court's decision, stating: "[W]e can find no error in the district court's conclusion of law that the English-only policy evinces an unlawful disparate impact based on national origin." Sandoval v. Hagan, 197 F.3d at 510. James Alexander, the ADPS director at the time the Court of Appeals for the Eleventh Circuit issued its opinion, petitioned the United States Supreme Court for certiorari review. The Supreme Court reversed the Eleventh Circuit's decision in Sandoval, addressing only the issue whether Title VI created a private right of action and concluding that such a right does not exist for the individual: "[W]e have found no evidence anywhere in the text to suggest that Congress intended to create a private right to enforce regulations promulgated under § 602 [of Title VI]." Alexander v. Sandoval, 532 U.S. at 291, 121 S.Ct. 1511.
After a careful examination of the record, we note that Riley, in support of *1005 his motion for a summary judgment, attached his answers to Cole's interrogatories, which indicated that permitting individuals of limited English proficiency to take the written portion of the Alabama driver's license test in their native language helped those individuals to obtain a valid driver's license, thereby fostering the assimilation of those individuals and their families into the community by increasing their access to education, employment, and shopping. Cole did not move to strike this evidence, nor did he proffer any evidence in rebuttal. Under our settled law, Cole's evidentiary burden required Cole to present substantial evidence creating a genuine issue of material fact as to whether administering the written portion of the driver's license test in multiple languages diminishes English as Alabama's common language or that English-only testing is necessary to "preserve and enhance" English as Alabama's common language. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala.1989), and Hobson, supra. Cole offered no such evidence. That is, Cole made no showing in the record of any evidence to create a genuine issue of material fact either that administering the written portion of the driver's license test only in English was necessary to "preserve and enhance" English as Alabama's common language or that multiple-language testing diminishes English as Alabama's common language. Statements concerning which individuals did or did not support the English-only policy in the past or an interpretation of Amendment No. 509 by the office of the Alabama attorney general or policy arguments regarding possible losses of federal funding if the tests are administered in English only do not constitute relevant evidence on these points. Farmer v. Hypo Holdings, Inc., 675 So.2d 387 (Ala.1996); Smith v. Madison County Comm'n, 658 So.2d 422 (Ala.1995). Thus, Riley's evidence that administering the written portion of the driver's license test in multiple languages does not run afoul of Amendment No. 509 stands unrebutted.
Assuming, without deciding, that Amendment No. 509 is self-executing,[2] at least with respect to the actions required by "State officials" in the context of this case, we conclude that Cole failed to provide evidence creating a genuine issue of material fact as to whether multiple-language testing diminishes or erodes English as Alabama's common language or that English-only testing is necessary to preserve and enhance English as Alabama's common language. Accordingly, the summary judgment for Riley is due to be affirmed. In light of this determination, we pretermit consideration of the precedential value of Sandoval v. Hagan, 197 F.3d 484 (11th Cir.1999).
AFFIRMED.
LYONS and WOODALL, JJ., concur.
SEE and SMITH, JJ., concur specially.
STUART, BOLIN, PARKER, and MURDOCK, JJ., dissent.
SEE, Justice (concurring specially).
I concur with the main opinion  Cole "made no showing in the record of any evidence to create a genuine issue of material fact either that administering the written portion of the driver's license test only in English was necessary to `preserve and enhance' English as Alabama's common language or that multiple-language testing diminishes English as Alabama's common language." 989 So.2d at 1005. I also join *1006 Justice Smith's special writing. I write specially to explain why I believe that evidentiary support was necessary for Cole to avoid a summary judgment.
There are two substantive aspects to Amendment No. 509 (now codified at § 36.01, Ala. Const. 1901 (Off.Recomp.)), that may be discerned without the necessity of skipping about in the language of the amendment.[3] The first is the official-language provision:
"English is the official language of the state of Alabama. The legislature shall enforce this amendment by appropriate legislation...."
The second is the common-language provision:
"The legislature and officials of the state of Alabama shall take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced. The legislature shall make no law which diminishes or ignores the role of English as the common language of the state of Alabama."[4]
At least 26 states have an official-language provision adopted by legislation or constitutional amendment. Crystal Goodson Wilkerson, Comment, Patriotism or Prejudice: Alabama's Official English Amendment, 34 Cumb. L.Rev. 253, 258-59 n. 35 (2003-2004). Generally, these constitutional and legislative provisions either simply recognize English as the state's "official language" or mandate the use of English for certain official purposes, in some cases to the exclusion of other languages ("English-only" provisions). Id. (citing Ruiz v. Hull, 191 Ariz. 441, 452, 957 P.2d 984, 995 (1998)). Cole would prevail in this case as a matter of law if Amendment No. 509 is "English only."
What I will call recognition-type official-language provisions are generally limited to a single sentence or phrase declaring that English is the state's official language. See Ark.Code. Ann. § 1-4-117; 5 Ill. Comp. Stat. Ann. 460/20; Ind.Code. § 1-2-10-1; Miss.Code Ann. § 3-3-31; N.C. Gen.Stat. § 145-12; N.D. Cent.Code § 54-02-13; and S.C.Code Ann. § 1-1-696.
Many state "official-language" provisions, on the other hand, explicitly provide that state business shall be conducted in English, setting forth with some specificity the instances in which English must be used. See Ariz. R.S. Const. Art. 28 (English is "the official language of the State of Arizona": "the language of ... all government functions and actions." The "State and all [its] political subdivisions" (including "all government officials and employees during the performance of government business") "shall act in English *1007 and in no other language."); Ga.Code Ann. § 50-3-100 ("The official language shall be the language used for each public record... and each public meeting ... and for official Acts of the State of Georgia, including those governmental documents, records, meetings, actions, or policies which are enforceable with the full weight and authority of the State of Georgia."); Iowa Code § 1.18 ("All official documents, regulations, orders, transactions, proceedings, programs, meetings, publications, or actions taken or issued, which are conducted or regulated by, or on behalf of, or representing the state and all of its political subdivisions shall be in the English language."); Mont.Code Ann. § 1-1-510 ("English is the official and primary language of: (a) the state and local governments; (b) government officers and employees acting in the course and scope of their employment; and (c) government documents and records."); N.H.Rev.Stat. Ann. § 3-C:1 ("English is designated as the language of all official public documents and records, and of all public proceedings and nonpublic sessions."); S.D. Codified Laws § 1-27-20 ("The common language of the state is English. The common language is designated as the language of any official public document or record and any official public meeting."); Tenn.Code Ann. § 4-1-404 ("English is hereby established as the official and legal language of Tennessee. All communications and publications, including ballots, produced by governmental entities in Tennessee shall be in English, and instruction in the public schools and colleges of Tennessee shall be conducted in English unless the nature of the course would require otherwise."); Utah Code Ann. § 63-13-1.5 ("[A]ll official documents, transactions, proceedings, meetings, or publications issued, conducted, or regulated by, on behalf of, or representing the state and its political subdivisions shall be in English."); and Wyo. Stat. Ann. § 8-6-101 ("Except as otherwise provided by law, no state agency or political subdivision of the state shall be required to provide any documents, information, literature or other written materials in any language other than English.").
The Alabama provision, like the recited recognition-type official-language provisions, and unlike those that mandate the use of English or English only, simply states that "English is the official language of the state of Alabama." To the extent that Alabama's official-language provision may have the potential to require the exclusive use of English in all governmental functions, it is not self-executing, as is made apparent by the second sentence: "The legislature shall enforce this amendment by appropriate legislation."[5] The legislature has not acted pursuant to this constitutional authorization, and the courts must await the passage of implementing legislation to act on the official-language aspect of § 36.01.[6]
The second aspect of § 36.01 is the common-language *1008 provision.[7] It requires that State officials "take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced."[8] The amendment could have repeated the term "official language" from the first sentence when it addressed the obligations of State officials, but it did not. Therefore, "common language" must be something different from "official language."[9] I do not find, either in the amendment itself or elsewhere, a definition of "common language." The definitions of "common" that appear most applicable are: "1a. of or relating to a community at large ...: generally shared or participated in by individuals of a community; not limited to one person or special group ...; b. known to the community...." Webster's Third New International Dictionary 458 (1971). Thus, the question presented by Cole is whether Governor Riley and the ADPS official (hereinafter collectively referred to as "Riley"), in offering the written portion of the driver's license examination in alternative languages, are taking "all steps necessary to preserve and enhance the role of English as the" language shared or participated in by individuals of the community.
The determination whether State officials have taken "all steps" is impacted by two terms that follow and modify those words, which must be considered in their ordinary senses. Officials are required to take only those steps that "insure that the role of English as the common language of the state of Alabama is preserved and enhanced," and, then, only those steps that are "necessary" to that end.[10]
*1009 We have some guidance in construing the word "necessary" when it is used in a constitutional context. As Chief Justice Marshall noted in M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), with regard to the term "necessary and proper" found in Art. I, § 8, cl. 18, of the Constitution of the United States:
"Is it true, that this is the sense in which the word `necessary' is always used? Does it always import an absolute physical necessity, so strong, that one thing to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable."
17 U.S. (4 Wheat.) at 413-14. Thus, those actions required of State officials may be either those absolutely necessary to, or those convenient to, ensuring the preservation and enhancement of the role of English as the common language of the State of Alabama. "In considering this question,... we must never forget that it is a constitution we are expounding." M'Culloch v. Maryland, 17 U.S. (4 Wheat.) at 407. Constitutional language should be construed broadly to enable the government the latitude necessary to carry out essential and desired governmental functions. As Chief Justice Marshall said in M'Culloch:
"It must have been the intention of those who gave these powers, to insure... their beneficial execution. This could not be done, by confiding the choice of means to such narrow limits as not to leave it in the power of congress to adopt any which might be appropriate, and which were conducive to the end."
17 U.S. (4 Wheat.) at 415. The interpretation of the term "necessary"  which serves as a restriction on the power of the State to act  that in this context best comports with its use in a constitution is that State officials must take all steps definitely necessary or essential to preserve and enhance the use of English as the common language of the State of Alabama. To interpret the term "necessary" broadly to include anything that might be conducive to that end would potentially paralyze the legislature in the performance of its duties.
Whether the executive department, acting through ADPS as "officials of the state of Alabama," is taking all steps necessary to ensure the preservation and enhancement of the role of English as the language that is common to the people of Alabama is a question of fact. Riley does not dispute that administering the written portion of the driver's license examination in languages other than English is his action through ADPS or that he is an official of the State of Alabama as that term is used in Amendment No. 509. Riley states that, as a State official, he administers the written portion of the driver's license examination in languages other than English because, in compliance with § 36.01, doing so fosters the integration *1010 into the community of those persons of limited English proficiency. He says that allowing them to drive, and thereby to secure a job or an education, to shop, or to participate in other community activities where they must use English, will help them to assimilate and by doing so enhances and preserves English as the common language.
Cole argues that statutory interpretation is a pure question of law and that "it was improper for the trial court to require evidence from either side regarding the proper legal interpretation of the terms... in Art. I, § 36.01." Cole's brief at 26 (emphasis in original). However, § 36.01 is not a pure English-only provision; therefore, the question is one of fact, namely, whether ADPS's practice of giving the written portion of the driver's license examination in languages other than English is inconsistent with its constitutional obligation. For the reasons stated in Justice Smith's special writing, and because Cole did not provide substantial evidence to support his claim that ADPS's practice of giving the written portion of the driver's license examination in languages other than English violates § 36.01, a summary judgment in favor of Riley was proper.
Although I agree with Justice Murdock that § 36.01 is partially self-executing, for the reasons stated above I cannot agree that it is an English-only provision. Moreover, State officials are not charged to "maintain English as `the official language' of this State." 989 So.2d at 1020 (Murdock, J., dissenting). Instead, they are charged to "take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced." The question whether State officials are taking all steps necessary, as § 36.01 requires, is a factual one, and evidence of some sort is necessary to establish that offering the written portion of the driver's license examination in English only is a step that is necessary to ensure that the role of English as the common language is preserved and enhanced.
Justice Murdock argues:
"It cannot reasonably be disputed that, if driver's license examinations are given only in English, the above-stated benefits of a driver's license will provide an incentive for individuals with limited or no English proficiency to learn English and will cause some individuals to learn English who would not have done so otherwise."
989 So.2d at 1021 (Murdock, J., dissenting). I do not disagree with Justice Murdock that an English-only policy may cause some individuals to learn English, though it can equally be said that it might impede others. The question of fact remains, however, whether administering the written portion of the driver's license examination only in English is a step necessary to preserving and enhancing the role of English as Alabama's common language. Justice Murdock relies on common sense; common sense, however, supports not only his argument but also the converse argument offered by Riley that administering the written portion of the driver's license examination in additional languages will foster integration into the community and thereby enhance the role of English as the common language of Alabama.[11]
*1011 For the foregoing reasons I concur in the main opinion and in Justice Smith's special writing.
SMITH, J., concurs.
SMITH, Justice (concurring specially).
I concur in the Court's decision to affirm the summary judgment entered in favor of the State defendantsGovernor Bob Riley and W.M. Coppage, director of the Alabama Department of Public Safety ("ADPS"). I write separately to elaborate on my rationale for doing so.
This Court has developed a standard for evaluating claims that challenge the constitutionality of a governmental action. We have not before addressed a claim brought to enforce Amendment No. 509, and the plaintiffs do not suggest what standard would be appropriate; therefore, in evaluating the action of a coordinate branch of government I am compelled to apply a strong presumption in favor of the constitutionality of the challenged action. See State ex rel. King v. Morton, 955 So.2d 1012 (Ala.2006). In Morton, this Court described the standard of review for constitutional challenges of legislative acts as follows:
"`Our review of constitutional challenges to legislative enactments is de novo.' Richards v. Izzi, 819 So.2d 25, 29 n. 3 (Ala.2001). Additionally, acts of the legislature are presumed constitutional. State v. Alabama Mun. Ins. Corp., 730 So.2d 107, 110 (Ala.1998). See also Dobbs v. Shelby County Econ. & Indus. Dev. Auth., 749 So.2d 425, 428 (Ala.1999) ('In reviewing the constitutionality of a legislative act, this Court will sustain the act "`unless it is clear beyond reasonable doubt that it is violative of the fundamental law.'"' White v. Reynolds Metals Co., 558 So.2d 373, 383 (Ala.1989) (quoting Alabama State Fed'n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944))). We approach the question of the constitutionality of a legislative act `"`with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government.'"' Monroe v. Harco, Inc., 762 So.2d 828, 831 (Ala.2000) (quoting Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 159 (Ala.1991), quoting in turn McAdory, 246 Ala. at 9, 18 So.2d at 815).
"Moreover, in order to overcome the presumption of constitutionality, ... the party asserting the unconstitutionality of the Act ... bears the burden `to show that [the Act] is not constitutional.' Board of Trustees of Employees' Retirement Sys. of Montgomery v. Talley, 291 Ala. 307, 310, 280 So.2d 553, 556 (1973). See also Thorn v. Jefferson County, 375 So.2d 780, 787 (Ala.1979) (`It is the law, *1012 of course, that a party attacking a statute has the burden of overcoming the presumption of constitutionality....')."
955 So.2d at 1017. That same beyond-a-reasonable-doubt standard applies in an action challenging an executive policy decision. See Opinion of the Justices No. 1, 209 Ala. 593, 598, 96 So. 487, 492-93 (1923) ("`[I]n judicially testing and determining the constitutionality of legislative or executive action the Supreme Courtin the discharge of its high and concluding judicial functionalways enters upon such an inquiry with the presumption, suggested by the deference due from one department to another, that the other department has not ignored or violated the Constitution; and this judicial presumption requires the sustaining of legislative or executive act, unless its invalidity appears beyond a reasonable doubt.'"). The plaintiffs, members of the nonprofit organization "Pro English," allege that offering the written portion of the driver's license test in a language other than English violates the requirement in Amendment No. 509 that the State officials "take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced" (emphasis added). Thus, to prevail on their constitutional challenge, the plaintiffs have the burden of proving beyond a reasonable doubt that the challenged actioni.e., giving the written portion of the driver's license test in a language other than Englishis not a step "necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced."
Amendment No. 509 is an "official-English"[12] amendment, not an "English-only"[13] amendment. Thus, Amendment No. 509 requires State officials to "take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced"; it does not expressly require that all government business be conducted in English. Accordingly, in determining whether a challenged action conforms to Amendment No. 509, the question is not simply whether a State official's action is a communication in English only. Instead, the question is whether the action is a "step" that is "necessary to ensure that the role of English as the common language of the state of Alabama is preserved and enhanced."
In the present case, there is undisputed evidence that supports the defendants' position that giving the written portion of the driver's license test in a language other than English is a "necessary [step] to insure that the role of English as the common language of the state of Alabama is preserved and enhanced." In its "Reply to Plaintiffs' Response to Defendants' Motion *1013 for Summary Judgment," the defendants offer the following:
"3. More importantly, Plaintiffs do not dispute ... any of the other facts recited in Defendants' Narrative Summary, including:
"`16. All 50 states provide some form of accommodation in their driver's license examinations for persons who do not understand English well. See Compl. ¶ 17 (naming only 6 states (Alaska, Maine, New Hampshire, Oklahoma, South Dakota, and Wyoming) that Plaintiffs allege offer their driver's license examinations exclusively in English); Aff. of J. Haran Lowe, Jr. ¶ 7 (reporting, based on investigation, that Alaska, Maine, New Hampshire, Oklahoma, South Dakota, and Wyoming all accommodate persons who do not understand English either (1) with a written translation of driver's license examination or (2) by permitting use of interpreters) (Exhibit 4).
"`....
"`18. "`The Policy' ['of administering... regular (i.e., noncommercial) driver's license examination[s] in multiple languages'] `preserves and enhances the role of English as the common language of the State of Alabama' by requiring [persons with limited English proficiency (`LEP persons')] to learn enough English to understand and obey English road signs and by facilitating greater integration of LEP persons into the community, where English is the predominant language used. By facilitating integration of LEP persons into the community, `The Policy' allows LEP persons to have greater contact with the English language and more opportunities to learn English through informal and formal means." Defs.' Answer to Pls.' Interrog. No. 6."'
In its order granting the defendants' summary-judgment motion, the trial court noted that although the
"plaintiffs dispute [the] defendants' assertion that their current policy of multiple language examinations has `preserved and enhanced' the role of English as the State's common language, ... they have not presented any evidence to dispute the factual premise of this assertion, i.e., that the ... policy of multi-language testing `facilitates greater integration of LEP [limited English proficiency] persons into the community,' where English is the predominant language used."
On appeal, the plaintiffs object to the trial court's acceptance of the defendants' proffered reason for the challenged practice. For example, the plaintiffs note:
"Rather than construing the facts in the light most favorable to Plaintiffs as the law requires, .... the trial court's decision cites as `fact' several statements in Defendants' discovery responses, even though there is absolutely no evidence in the record to support the statements.... The most egregious example of this occurs at page 5 of the opinion, wherein the trial court simply accepts as true a statement in Defendants' interrogatory answers that `[ADPS] Policy allows LEP persons to have greater contact with the English language and more opportunities to learn English through formal and informal means.' (C. at 611, quoting Defs' Answer to Pls.' Interrog. No. 6). It was error for the trial court to credit Defendants' own bald, self-serving assertion on such a hotly contested issue (going directly to Defendants' compliance with Art. I, § 36.01), without requiring any evidence to support it. See Camp [v. Yeager], 601 *1014 So.2d [924] at 929 [(Ala.1992)] (weighing of evidence is a jury function)."
(Plaintiffs' brief, pp. 46-47.)
There are three problems with the plaintiffs' position, however. First, the defendants have offered evidence to support their assertion that the challenged practice  offering the written portion of the driver's license test in languages other than Englishis consistent with Amendment No. 509. Second, the plaintiffs have offered no evidence showing that the challenged practice is not a necessary step in preserving and enhancing the role of English as the common language of Alabama. Finally, although the plaintiffs have offered evidence showing a change in practice by the defendants, the plaintiffs have not offered evidence to show that the current practice is unreasonable.
The defendants justify the current practice by starting with the premise that having a driver's license increases a person's mobility and thereby increases the person's opportunities for work, shopping, educational activities, and leisure activities. The plaintiffs do not dispute that premise, nor does the dissenting opinion. 989 So.2d at 1021 (Murdock, J., dissenting) ("A driver's license can provide a significant benefit to an individual; it can facilitate mobility and thereby facilitate work, shopping, education, and leisure activities."). In addition to that factual premise, the defendants point out that all other statesincluding 25 states with "official-English" provisionsaccommodate persons with limited English proficiency in administering their driver's license tests. Although the plaintiffs argue that this fact "has no legal significance" (Plaintiffs' reply brief, p. 22), they do not dispute that all other states provide driver-license-test accommodations to persons with limited English proficiency.
Based on those two undisputed factual premises, the defendants concluded that providing the written portion of the driver's license test in languages other than English makes it easier for persons with limited English proficiency to learn English. Although the plaintiffs disagree with the defendants' conclusion (i.e., that having a driver's license makes it easier for persons with limited English proficiency to learn English), the plaintiffs do not disagree with the premises on which that conclusion is based (i.e., that all other states offer some accommodation to persons with limited English proficiency and that having a driver's license increases mobility and thereby facilitates work, shopping, educational activities, and leisure activities). More importantly, the plaintiffs have not offered evidence to suggest that the defendants' conclusion is unreasonable or to contradict the premises on which it is based.
Rather than casting doubt on the reasonableness of the defendants' position, the plaintiffs' evidence shows only: (1) that the current method of administering the written portion of the driver's license test is different than it has been in the past; and (2) that other State officials at one time or another have advocated a policy of giving the written portion of the driver's license test in English only. For example, the plaintiffs offered evidence indicating that following the adoption of Amendment No. 509 ADPS began administering the written portion of the driver's license test exclusively in English but later changed to its current practice of offering the written portion of the test in other languages. However, the change by ADPS from its practice following the ratification of Amendment No. 509 of testing in English only shows merely that there has been a change in practice; it does not suggest that either the current or the former practice is unreasonable. The requirement in *1015 Amendment No. 509 that State officials must take "all steps necessary" does not mean that State officials may adopt only one practice and never again vary from it.[14]
Another item on which the plaintiffs rely is an opinion of the attorney general that includes the following statement: "All persons applying for a driver's license should be required by the Director of the Department of Public Safety to take their licensing tests in English." Op. Att'y Gen. No. 92-411 (Sept. 15, 1992). However, that opinion does not suggest that the current practice is unreasonable. Indeed, the opinion recognizes that Amendment No. 509 does not require an ironclad policy of English only. It states: "Thus, to the extent possible, officials of this state should require the use of English in all state actions and programs." (Emphasis added.) The attorney general's opinion is based primarily upon practical considerations, such as those reflected in the following statements: "It would be practically impossible for the state to accommodate the wide variety of languages of persons applying for a license" (emphasis added) and "allow[ing] such persons to use their own interpreters would, of course, jeopardize the integrity of the test." Apparently, however, the defendants have concluded that those practical considerations no longer pose the barrier they once did to accommodating persons with limited English proficiency. In any event, the plaintiffs do not argue that the constitutionality of the challenged action turns on questions of practicality.
Although Amendment No. 509 grants jurisdiction to Alabama courts "to hear cases brought to enforce this provision," the plaintiffs have not suggested that Amendment No. 509 modifies Alabama's separation-of-powers provisions.[15] Thus, this Court may not interfere with the action of a coordinate branch of government unless it is shown beyond a reasonable doubt that the action is unconstitutional. In the present case, the defendants have offered a reasonable justification for the challenged practice as a "necessary" step in implementing the mandate of Amendment No. 509. In response, the plaintiffs have offered evidence showing only that the defendants' current practice is different *1016 than the former practice. But the plaintiffs have not offered substantial evidence showing that the defendants' current practice is unreasonable. Consequently, the plaintiffs have failed to offer substantial evidence showing that the challenged action is unconstitutional, and the summary judgment in favor of the defendants was appropriate.
SEE, J., concurs.
BOLIN, Justice (dissenting).
I join in Justice Murdock's well-reasoned dissent. I agree with that part of the rationale of the dissent concluding that, based upon the record before us, summary judgment should have been entered for the plaintiffs, not the defendants.
The self-executing portion of Amendment No. 509 (Art. I, § 36.01, Ala. Const. 1901 (Off.Recomp.)), the portion pertinent to this appeal, reads as follows:
"English is the official language of the state of Alabama.... [O]fficials of the state of Alabama shall take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced....
"Any person who is a resident of or doing business in the state of Alabama shall have standing to sue the state of Alabama to enforce this amendment, and the courts of record of the state of Alabama shall have jurisdiction to hear cases brought to enforce this provision...."
As the main opinion notes, written tests for driver's licenses in the State of Alabama were administered "in multiple foreign languages from the 1970s to 1991." 989 So.2d at 1004. Perhaps in response to this practice, either in whole or in part, the voters of the State of Alabama overwhelmingly ratified Amendment No. 509 in 1990. Thereafter, the Alabama Department of Public Safety reimplemented the practice of giving the written portion of the driver's license test in English only.
Concerning the amendatory process attendant to the proposed United States Constitution, Thomas Jefferson wrote in 1787: "[H]appily for us, that when we find our constitutions defective and insufficient to secure the happiness of our people, we can assemble with all the coolness of philosophers, and set it to rights, while every other nation on earth must have recourse to arms to amend or to restore their constitutions." Thomas Jefferson, Letter to Monsieur Dumas, September 10, 1787, 6 The Writings of Thomas Jefferson 295 (Andrew A. Lipscomb & Albert Ellery Bergh eds., The Thomas Jefferson Memorial Association of the United States Mem'l ed., 1903). In 1990, the citizenry of Alabama apparently found the Alabama Constitution of 1901 "defective and insufficient to secure the happiness of our people" with regard to the status of English as the official state language, and ratified Amendment No. 509. Undoubtedly, Thomas Jefferson would have approved of the process.
However, as we now know, the process did not end there, and the State once again, in response to a decision by the United States District Court in a case brought by Martha Sandoval challenging English-only testing, began administering the written portion of the driver's license test in multiple foreign languages. The State now defends this practice, even after Sandoval v. Hagan, 197 F.3d 484 (11th Cir.1999), was overruled by the United States Supreme Court on procedural grounds. Alexander v. Sandoval, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). The majority opinion does not render a judgment for the plaintiffs or even reverse the summary judgment in favor of the defendants to allow further action in *1017 the trial court; therefore, I close by quoting, in response to the majority's affirmance of the summary judgment for the State defendants, two other writings of Thomas Jefferson regarding his thoughts on constitutional interpretation as our United States Constitution matured over the first three decades of our country's existence: First: "Our peculiar security is in the possession of a written Constitution. Let us not make it a blank paper by construction." Thomas Jefferson, Letter to Wilson C. Nicholas, September 7, 1803, 10 The Writings of Thomas Jefferson, 419, and last:
"On every question of construction, carry ourselves back to the time when the Constitution was adopted, recollect the spirit manifested in the debates, and instead of trying what meaning may be squeezed out of the text, or invented against it, conform to the probable one in which it was passed.
"....
"... Laws are made for men of ordinary understanding, and should, therefore, be construed by the ordinary rules of common sense. Their meaning is not to be sought for in metaphysical subtleties, which may make anything mean everything or nothing, at pleasure."
Thomas Jefferson, Letter to Judge William Johnson, June 12, 1823, 15 The Writings of Thomas Jefferson 449-50.
Jefferson's insights are equally applicable to the interpretation of amendments to state constitutions. What the officials of the State of Alabama have accomplished, in offering the written portion of the driver's license test in 12 (so far) foreign languages, is to revise Amendment No. 509 into a "blank paper by construction" and to "squeeze[ ] out of the text" "metaphysical subtleties, which may make anything mean everything or nothing, at pleasure." (Emphasis added.)
Thousands of foreign languages and dialects are spoken around the globe. Why should anyone speaking any one of those languages, seeking to take a driver's license test in their native tongue, be treated differently than someone who speaks one of the 12 foreign languages in which the driver's license test is currently being offered? Or for that matter, why should anyone else who speaks a foreign language and who wants to communicate with any other department or branch of state government not be entitled to do so in their native language? By rendering meaningless Amendment No. 509, the majority will make it difficult, if not impossible, to draw a line.
The immigrants who came to Alabama by way of Ellis Island in the early 20th century did not have the benefit of a tortured construction of Amendment No. 509 and evidently "assimilated" the wrong way  they actually learned the English language.
MURDOCK, Justice (dissenting).
"`Constitutions are the result of popular will, and their words are to be understood ordinarily as used in the sense that such words convey to the popular mind' (6 Am. & Eng. Ency. Law, 924, 925)." Hagan v. Commissioner's Court of Limestone County, 160 Ala. 544, 562, 49 So. 417, 423 (1909).
Art. I, § 36.01, Constitution of Alabama of 1901 (Off.Recomp.), states as follows:
"English is the official language of the state of Alabama. The legislature shall enforce this amendment by appropriate legislation. The legislature and officials of the state of Alabama shall take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced. The legislature shall make no law which diminishes or *1018 ignores the role of English as the common language of the state of Alabama.
"Any person who is a resident of or doing business in the state of Alabama shall have standing to sue the state of Alabama to enforce this amendment, and the courts of record of the state of Alabama shall have jurisdiction to hear cases brought to enforce this provision. The legislature may provide reasonable and appropriate limitation on the time and manner of suits brought under this amendment."
(Emphasis added.)
As judges, we are called upon to decide the meaning and proper application of constitutional provisions such as these. Sometimes that task can be relatively simple, requiring us to take note of what is plain on the face of a constitutional provision and apply that provision without making the task more complicated than it needs to be.
Certainly, the process of deciding cases such as this one requires us, as judges, to apply rules of pleading, evidence, and other common law principles that, in many cases, have been shaped and developed over many years. And for good reason: such rules have, themselves, been developed in an effort to channel our judicial efforts toward a just result. In applying these rules, however, we are not required to leave our everyday experience and common sense at the courthouse door. "[T]he Constitution is not to have a narrow or technical construction, but must be understood and enforced according to the plain, common-sense meaning of its terms." Hagan, 160 Ala. at 554, 49 So. at 420. Cf. Patton v. Werner Co., 793 So.2d 817, 821 (Ala.Civ.App.2001) (referencing use of "common sense" and "everyday experience" in the assessment of evidence); Marzullo v. Kahl, 366 Md. 158, 188, 783 A.2d 169, 191 (2001) (courts "do not set aside common experience and common sense" when construing statutes). Where appropriate, we should use our "common sense, common reason, and common observation as well as our common knowledge of the usual acts of men and women under given circumstances." Patton, 793 So.2d at 821.
Further, "[c]onstitutions are made for practical purposes, ... and in the construction of them, we are to take into consideration the conditions which confronted the constitution makers, and we are, if possible, to give the instrument such construction as will carry out the intention of the framers, and make it reasonable rather than absurd." State ex rel. Covington v. Thompson, 142 Ala. 98, 107, 38 So. 679, 682 (1905). "`"In construing a constitutional provision, the courts have no right to broaden the meaning of words used and, likewise, have no right to restrict the meaning of those words."' This Court is `"not at liberty to disregard or restrict the plain meaning of the provisions of the Constitution."'" City of Bessemer v. McClain, 957 So.2d 1061, 1092 (Ala. 2006) (opinion on second application for rehearing) (quoting City of Birmingham v. City of Vestavia Hills, 654 So.2d 532, 538 (Ala.1995), quoting in turn McGee v. Borom, 341 So.2d 141, 143 (Ala.1976)). Cf. Farrior v. Lawrence County, 491 So.2d 233, 234-35 (Ala.1986) ("[I]n determining legislative intent, this Court will give words and phrases the same meaning they have in ordinary, everyday usage."). See also University of Utah v. Shurtleff, 144 P.3d 1109, 1117 (Utah 2006) ("The cardinal rule of constitutional interpretation is to begin with the plain language of the provision in question.").
Both the construction of § 36.01, as first set out below, and the evaluation of the facts and evidence before us in this summary-judgment case, as discussed at the *1019 end of this writing, are shaped by the foregoing principles.

Section 36.01 is Partially Self-Executing
Section 36.01 is partially self-executing.[16] Specifically, it mandates certain conduct on the part of State officials, as opposed to the legislature. It requires State officials to observe and maintain English as Alabama's "official language." It also mandates that State officials take all steps reasonably[17] necessary to "insure" the "preserv[ation]" and "enhance[ment]" of English as Alabama's "common language." Nothing in § 36.01 requires the legislature to act before State officials are required to abide by these provisions. This conclusion is bolstered by three basic aspects of § 36.01.
First, as noted, § 36.01 does not speak only of the preservation and enhancement of English as Alabama's "common language." Instead, it begins with the simple statement that "English is the official language of the state of Alabama." This statement makes no distinction between legislative- and executive-branch officials. Its import, insofar as providing guidance or limitations, is not restricted to the legislative branch.
Second, insofar as § 36.01 requires the preservation and enhancement of English as Alabama's "common language," it does not merely say that "the legislature" shall take all steps necessary to ensure this result. Instead, the second sentence of § 36.01 plainly imposes this obligation directly upon "officials of the state of Alabama." If the intention was merely to mandate some action on the part of the legislature, there would have been no need to include a mandate directed specifically to State officials.
Finally, the first sentence of the second paragraph of § 36.01 contains express self-execution language. It explicitly gives to each resident of the State of Alabama the legal standing to bring a lawsuit, just as the plaintiffs have done in the present case, "to enforce this amendment." It also explicitly gives the courts of this State jurisdiction to hear such lawsuits. These provisions of the second paragraph refer to enforcement of "this amendment"; they contain no distinction between those portions of § 36.01 directed toward the legislature *1020 and those portions directed toward State officials.

Applying Section 36.01
Driver's license tests are perhaps the most "common" experience through which the State and its citizens interact and of necessity engage in substantial written and oral communication with one another.[18]
If State officials truly are to maintain English as "the official language" of this State, can it seriously be questioned but that the State should communicate with its citizens in English, at least where there is no compelling reason for it not to do so? Is opinion testimony from a witness necessary to enable this Court to decide whether the State's communications with its citizens for purposes of something so basic and universal as a driver's license test, in a language other than English, is in tension with the constitutional mandate given by the people of Alabama to their State officials to observe and maintain English as the State's "official language"?
Concomitantly, if State officials truly are to take "all steps" reasonably necessary to "insure" the "preserv[ation]" and "enhance[ment]" of English as the common language of this State, can it seriously be questioned but that the State should communicate with its citizens in English, again, where there is no compelling reason for it not to do so? Is any testimony truly necessary to establish that the State's communications with its citizens for purposes of something so "common" as a driver's license test in a language other than English is inconsistent with the clear and simple mandate to State officials to take "all steps" reasonably necessary to "insure" the "preserv[ation]" and "enhance[ment]" of English as the common language of this State? Does not the "ordinary" understanding of these terms and "the sense that such words convey to the popular mind," Hagan, 160 Ala. at 562, 49 So. at 423, call for a negative answer to these questions?
It may be that the constitutional provision before us today does not come equipped with a simple litmus test that makes its interpretation and application to the acts and omissions of State officials easily discernible in every case. One need look no further, however, than the myriad United States Supreme Court and other federal court decisions over the last 140 years attempting to sort out the meaning and effect of the Equal Protection and Due Process Clauses of the United States Constitution in order to be assured that the enforceability of a constitutional provision does not depend upon the inclusion in it of easily applied, textual standards. As to the particular case before us, my consideration of the foregoing questions leads me to the conclusion that the judgment of the trial court should be reversed, and this cause remanded for the entry of a summary judgment in favor of the plaintiffs.

The Evidentiary Record Before Us
Even if summary judgment in favor of the plaintiffs was not required on the basis of the foregoing, neither can we properly affirm the summary judgment in favor of the State officials given the facts before us. At a minimum, a genuine issue of material fact remains as to whether the decision of State officials in 1999 to stop giving the driver's license test in English only and *1021 begin giving it in multiple languages contravenes § 36.01.[19]
The following facts are beyond dispute:
English is the predominant language used in Alabama.
The vast majority of Alabama residents 16 years of age and older have a driver's license and drive. Most Alabama residents will, at some point in their lives, take a driver's license examination.
A driver's license can provide a significant benefit to an individual; it can facilitate mobility and thereby facilitate work, shopping, education, and leisure activities.
As previously noted, courts, where appropriate, should use their "common sense, common reason, and common observation as well as [their] common knowledge of the usual acts of men and women under given circumstances." Patton, 793 So.2d at 821. It cannot reasonably be disputed that, if driver's license examinations are given only in English, the above-stated benefits of a driver's license will provide an incentive for individuals with limited or no English proficiency to learn English and will cause some individuals to learn English who would not have done so otherwise. To this extent, it reasonably can be inferred that the English-only policy will tend to enhance English as the common language of this State.
On this basis alone, even if there was conflicting evidence from a State witness, a genuine issue of material fact exists as to whether the decision by State officials to stop giving the driver's license test only in English contravened their obligation to take all reasonably necessary steps to "insure" the preservation and enhancement of English as the common language of Alabama.
In addition, however, the record before us contains further evidence  circumstantial, documentary, and "testimonial"  all of which supports the proposition that administering the test in a language other than English is contrary to both the "official language" requirement and the "common language" requirement of § 36.01. Despite assertions otherwise, therefore, the evidence in favor of a summary judgment for the State defendants is by no means "undisputed." To the contrary, the record contains ample evidence that supports the plaintiffs' position and that makes a summary judgment in favor of the State defendants inappropriate.[20] Specifically, the *1022 record contains the following additional evidence indicating that administering the driver's license test in English only is a reasonably necessary step to ensure the preservation and enhancement of English as Alabama's common language and that giving the test in a language other than English is contrary to § 36.01:
1. The very fact that the Alabama Department of Public Safety ("ADPS") found it necessary and appropriate in December 1991 to change its policy of multilingual testing and begin administering the driver's license examination only in English in response to the ratification in 1990 of § 36.01.[21]
2. Deposition testimony by James Hamilton, the former post commander of the Alabama Department of Motor Vehicles, that ADPS had instructed him in writing to stop giving the examination in multiple languages because "the Legislature had passed ... a law which changed the Constitution and ... all state business had to be conducted in English." According to Hamilton's testimony, this was the only reason given to him by State officials for the change.
3. Deposition testimony of Robert Byers, an ADPS employee, that he had received written notification from the "chief examiner" in Montgomery of the necessity of giving the driver's license examination in English only because of the change in the Alabama Constitution and, again, that this was the only reason given to him for the change in the policy.
4. In December 1991 ADPS issued a revised examiner's guide, which stated:
"[Amendment No. 509] states, `English is the official language of the state of Alabama.' To insure the role of English as the official and common language *1023 of the state of Alabama is preserved and enhanced, all driver license examinations will be printed and administered in English."
(Emphasis added.) The examiner's guide was again revised and reissued in 1996, and the revised guide also contained the emphasized passage.
5. A 1992 attorney general's opinion advised ADPS that § 36.01 "prohibit[ed] [ADPS] from giving driver license tests in any language other than English." The opinion includes the following statement:
"This amendment requires all officials of the state of Alabama to take all steps necessary to insure that the role of English as the common language of the State of Alabama is preserved and enhanced. Thus, to the extent possible, officials of this state should require the use of English in all state actions and programs."
Op. Att'y Gen. No. 92-411 (Sept. 15, 1992) (emphasis added).
6. In 1998, then Congressman Bob Riley wrote the following in an opinion article in the editorial section of the Montgomery Advertiser:
"Does providing government documents and services to immigrants in their native language encourage or expand opportunities for them to learn English?

"Of course not. On the contrary, by communication in English, the government of Alabama encourages immigrants to learn the language in order to participate in government and society."
(Emphasis added.)
7. In July 1998, then Assistant Attorney General John J. "Jack" Park wrote to Congressman Riley:
"[T]he point that requiring [ADPS] to give driver's license examinations in languages other than English gives applicants little incentive to learn English is sound.

". . . .
"[S]ome, like Judge DeMent, think that we do a better job of Americanizing our immigrants if we do not call on them to learn English. Common sense says otherwise."
(Emphasis added.)
At a minimum, a genuine issue of material fact exists as to whether giving the driver's license examination in languages other than English is consistent with the observation and maintenance of English as this State's official language, and with the constitutional mandate from the people of Alabama to their State officials to take all steps reasonably necessary to ensure the preservation and enhancement of English as this State's common language.

Conclusion
I respectfully dissent.
STUART, BOLIN, and PARKER, JJ., concur.
On Application for Rehearing
COBB, Chief Justice.
APPLICATION OVERRULED.
SEE, LYONS, WOODALL, and SMITH, JJ., concur.
STUART, BOLIN, PARKER, and MURDOCK, JJ., dissent.
PARKER, Justice (dissenting).
Language is not merely mechanical names for objects and actions. Language is a way of thinking, feeling, and expressing. When one translates a passage from one language to another, it is often difficult and sometimes impossible to capture the full force or meaning of the original passage. People may become fluent in a second *1024 language, but they are moved in a special way when they hear a song or passage of literature in the language of their childhood.
The United States Supreme Court recognized the importance of language in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In 1919, the Nebraska Legislature enacted a statute that forbade teaching children in any language except English in any private, denominational, parochial, or public school, until a child had completed the eighth grade. The Nebraska Supreme Court upheld the law as constitutional. Meyer v. State, 107 Neb. 657, 187 N.W. 100 (1922). The United States Supreme Court reversed the judgment of the Nebraska Supreme Court, but it recognized the important public policy that the new law served. The United States Supreme Court quoted from the opinion of the Nebraska Supreme Court:
"`The salutary purpose of the statute is clear. The Legislature had seen the baneful effects of permitting foreigners, who had taken residence in this country, to rear and educate their children in the language of their native land. The result of that condition was found to be inimical to our own safety. To allow the children of foreigners, who had emigrated here, to be taught from early childhood the language of the country of their parents was to rear them with that language as their mother tongue. It was to educate them so that they must always think in that language, and, as a consequence, naturally inculcate in them the ideas and sentiments foreign to the best interests of this country. The statute, therefore, was intended not only to require that the education of all children be conducted in the English language, but that, until they had grown into that language and until it had become a part of them, they should not in the schools be taught any other language. The obvious purpose of this statute was that the English language should be and become the mother tongue of all children reared in this state. The enactment of such a statute comes reasonably within the police power of the state. Pohl v. State, 102 Ohio St. 474, 132 N.E. 20 [(1921)]; State v. Bartels, 191 Iowa 1060, 181 N.W. 508 [(1921)].'"
The United States Supreme Court reversed the judgment of the Nebraska Supreme Court and held the statute unconstitutional as applied to parents who sent their children to a Lutheran school at which they learned the German language. But the Court recognized the public policy the statute served:
"The desire of the Legislature to foster a homogeneous people with American ideals prepared readily to understand current discussions of civic matters is easy to appreciate. Unfortunate experiences during the late war and aversion toward every character of truculent adversaries were certainly enough to quicken that aspiration. But the means adopted, we think, exceed the limitations upon the power of the state and conflict with rights assured to the plaintiff in error."
Meyer, 262 U.S. at 402, 43 S.Ct. 625. The Court also stated: "Perhaps it would be highly advantageous if all had ready understanding of our ordinary speech, but this cannot be coerced by methods which conflict with the Constitution  a desirable end cannot be promoted by prohibited means." 262 U.S. at 401, 43 S.Ct. 625.
I completely agree with the United States Supreme Court that the Nebraska statute interfered with the right of parents to control the education of their children. But I also agree that it would be "highly advantageous" if our entire population understood *1025 the English language as the common tongue.
Unlike the Nebraska statute, Amendment No. 509 to the Alabama Constitution (now codified as § 36.01, Ala. Const. 1901 (Off. Recomp.)), as the plaintiffs construe it, conflicts with no constitutional right. It does not prohibit anyone from learning a foreign language or teaching a foreign language to his or her children. It does not prohibit anyone from speaking a foreign language, in private or in public. As construed by the plaintiffs, it requires only that driver's license examinations be administered solely in English. Nowhere in their pleadings do the defendants allege that the plaintiffs' construction of Amendment No. 509 conflicts with any federal or state constitutional right.
John Jay, later to become the first Chief Justice of the United States Supreme Court, wrote in Federalist No. 2:
"Providence has been pleased to give this one connected country to one united people  a people descended from the same ancestors, speaking the same language, professing the same religion, attached to the same principles of government, very similar in their manners and customs, and who, by their joint counsels, arms, and efforts, fighting side by side throughout a long and bloody war, have nobly established general liberty and independence."
The Federalist No. 2, at 7 (John Jay) (Bicentennial ed.1987).
I am emphatically not opposed to learning foreign languages. Thanks to a Rotary International Fellowship, I was the first foreign student admitted to the University of Sao Paulo School of Law, in Sao Paulo, Brazil. I did not expect my professors and fellow students to learn English in order to communicate with me; I became fluent in Portuguese so I could communicate with them. And I was greatly enriched by the experience.
America itself has been enriched by those who have come from other countries. However, a common language not only facilitates clear and effective communication; it also helps to foster a common vision for the nation. I therefore stand by my dissenting vote on original submission in this case.
NOTES
[1] By the time of the appeal to the United States Supreme Court, James Alexander had replaced L.N. Hagan as the director of ADPS
[2] A constitutional provision is considered to be self-executing when additional legislation is not required for it to be effective. In re Opinion of the Justices No. 94, 252 Ala. 199, 40 So.2d 330 (1949); Downs v. City of Birmingham, 240 Ala. 177, 198 So. 231(1940).
[3] This is consistent with Thomas Jefferson's admonition, recited in Justice Bolin's dissent:

"Laws are made for men of ordinary understanding, and should, therefore, be construed by the ordinary rules of common sense. Their meaning is not to be sought for in metaphysical subtleties, which may make anything mean everything or nothing, at pleasure."
Thomas Jefferson, Letter to Judge William Johnson, June 12, 1823, 15 The Writings of Thomas Jefferson 450 (Andrew A. Lipscomb & Albert Ellery Bergh eds., The Thomas Jefferson Memorial Association of the United States Mem'l ed., 1903).
[4] The remainder to § 36.01, the second paragraph, reads as follows:

"Any person who is a resident of or doing business in the state of Alabama shall have standing to sue the state of Alabama to enforce this amendment, and the courts of record of the state of Alabama shall have jurisdiction to hear cases brought to enforce this provision. The legislature may provide reasonable and appropriate limitation on the time and manner of suits brought under this amendment."
[5] As Justice Murdock notes in his special writing: "Clearly, part of § 36.01 provides that the legislature shall enforce this amendment by appropriate legislation. In this regard, obviously, `subsequent action by the legislature was contemplated to carry [§ 36.01] into effect,' and it is not self-executing. See In re Opinion of the Justices No. 94, 252 Ala. 199, 202, 40 So.2d 330, 333 (1949)." 989 So.2d at 1019 n. 16.
[6] See Hornsby v. Sessions, 703 So.2d 932, 940 (Ala. 1997) ("When a constitutional mandate is not self-executing, it is for the legislature to implement the mandate.")(citing Brown & Co. v. Seay, 86 Ala. 122, 5 So. 216 (1889)). "When dealing with a constitutional provision, this Court generally defers to the Legislature's reasonable construction of such a provision." Opinion of the Justices No. 368, 716 So.2d 1149, 1155 (Ala. 1998) (separate opinion of See, J.).
[7] I agree with Justice Murdock that "that portion of § 36.01 that guides and restrains the conduct of State officials" is self-executing because it is "`complete in itself and becomes operative without the aid of supplementary or enabling legislation.'" 989 So.2d at 1019 n. 16 (quoting Downs v. City of Birmingham 240 Ala. 177, 184, 198 So. 231, 236 (1940)). I understand that portion of § 36.01 that is self-executing to be the common-language provision, because it imposes a defined obligation on State officials to "take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced," and because the second paragraph of § 36.01 provides that "[a]ny person who is a resident of or doing business in the state of Alabama shall have standing to sue the state of Alabama to enforce this amendment, and the courts of record of the state of Alabama shall have jurisdiction to hear cases brought to enforce this provision."
[8] This obligation to preserve and enhance the role of English as the common language of the State is placed on the legislature as well as on officials of the State of Alabama. The case before us, however, is not a challenge to any action or inaction of the legislature; therefore, we need not address the legislative aspect of the provision.

The amendment further imposes a limitation on the legislature to "make no law which diminishes or ignores the role of English as the common language of the state of Alabama." This latter type of provision is familiar to courts; we are under a constitutional obligation not to enforce any statute that conflicts with a provision of the Constitution, in this case one that requires that no legislative act "diminish" or "ignore" the role of English as the common language of Alabama.
[9] See Trott v. Brinks, Inc., 972 So.2d 81, 85 (Ala.2007) ("We presume that the use of two different words indicates that the legislature intended the two words be treated differently."). But see Ex parte HealthSouth Corp., 978 So.2d 745, 752 (Ala.2007) (quoting United States v. Patterson, 55 F. 605, 639 (C.C.D.Mass.1893)).
[10] Amendment No. 509 is strikingly similar to California's constitutional amendment adopted four years before Alabama voters considered Amendment No. 509. Unfortunately, the California amendment has not been judicially construed. Moreover, the California amendment contains a proviso not included in the Alabama amendment  that the California Amendment is "not to supersede any of the rights guaranteed to the people by this Constitution." The only relevant interpretation of California's constitutional provision comes from the Supreme Court of Arizona, in Ruiz v. Hull, 191 Ariz. 441, 957 P.2d 984 (1998). That court expressed the view that because the California amendment expressly does not supersede any other rights, it "does not prohibit the use of languages other than English." Ruiz, 191 Ariz., at 452, 957 P.2d at 995 (footnote omitted).
[11] Justice Murdock's dissent recites as facts the decision of ADPS to test only in English following the passage of Amendment No. 509, an ADPS testing booklet that said all driver's license testing will be done in English to conform with Amendment No. 509, and statements from former ADPS employees and from a former Alabama attorney general to the same effect. These interpretations of § 36.01 are due some deference, but they are constructions of the law for which this Court is ultimately responsible, not statements of fact. The dissent also cites a statement reportedly made by Governor Riley when he was a Congressman expressing his opinion that "`providing government documents and services to immigrants in their native language [does not] encourage or expand opportunities for them to learn English,'" 989 So.2d at 1023; however, that is not the question before us. We are considering only the limited case of the availability of driver's license examinations. Finally, the dissent recites from a letter written by a former assistant attorney general stating that "`[t]he point that requiring [ADPS] to give driver's license examinations in languages other than English gives applicants little incentive to learn English is sound,'" 989 So.2d at 1023. This statement does not contradict the current position of ADPS that a driver's license does create opportunities to learn English and that these opportunities will introduce their own incentives. (The final statement about the common sense of the view "`that we do a better job of Americanizing our immigrants if we do not call on them to learn English'" is a non sequitur.) 989 So.2d at 1023 (Murdock, J., dissenting).
[12] As the trial court noted, Amendment No. 509 "makes English Alabama's official languagenot its only language." See also Crystal Goodson Wilkerson, Comment, Patriotism or Prejudice: Alabama's Official English Amendment, 34 Cumb. L.Rev. 253, 259 (2004) ("English-only laws promote English by prohibiting the use of other languages, while official English laws proclaim English the common language of the state without prohibiting non-English languages.... The most restrictive form of laws making English a state's official language designate English the official language of the state and forbid the state and its subdivisions from using languages other than English when performing government business." (emphasis added)).
[13] See Wilkerson, supra note 12, at 259-60 (discussing Arizona's "English-only" amendment Ariz. Const. art. XXVIIIwhich "provides that English is `the official language of the State of Arizona' and `the language of ... all government functions and actions'.... [and which stated that] `all government officials and employees during the performance of government business ... shall act in English and no other language'" (footnotes omitted)).
[14] The defendants note in their brief to this Court:

"Defendants do not deny that they have changed their minds, nor are they shamed by plaintiffs' relentless reminders....
"Indeed, it is the Plaintiffs' position, not the Defendants, that is mind-boggling. Even as they file briefs in this lawsuit advocating that the official-English provision of the Alabama Constitution is the equivalent of an English-only provision, the organization of which Plaintiffs are a part ProEnglishstates in large, bold letters on its website that `Official English doesn't mean "English only."' ProEnglish, Why Official English?, http://www.proenglish. org/issues/offeng/index.html (last visited April 24, 2006)."
(Defendants' brief, pp. 30-31 n. 4.)
[15] Section 42, Ala. Const. 1901 (Off.Recomp.), provides:

"The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."
Section 43, Ala. Const. 1901 (Off.Recomp.), provides:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
[16] Clearly, part of § 36.01 provides that the legislature shall enforce this amendment by appropriate legislation. In this regard, obviously, "subsequent action by the legislature was contemplated to carry [§ 36.01] into effect," and it is not self-executing. See In re Opinion of the Justices No. 94, 252 Ala. 199, 202, 40 So.2d 330, 333 (1949).

In other respects here pertinent, however, § 36.01 is self-executing. A constitutional provision is self-executing to the extent that it is "complete in itself and becomes operative without the aid of supplementary or enabling legislation." Downs v. City of Birmingham, 240 Ala. 177, 184, 198 So. 231, 236 (1940). That characteristic applies to that portion of § 36.01 that guides and restrains the conduct of State officials. The application of this constitutional provision may not be easy or readily apparent in every circumstance, but that does not require us to conclude that the legislature must act before State officials are bound by the provision.
[17] Section 36.01 must be read as incorporating a reasonableness standard. "While we construe this statute as mandatory, yet the law is a reasonable master, and it should be so construed in the light of common sense in ascertaining the legislative intent." Stith Coal Co. v. Sanford, 192 Ala. 601, 606-07, 68 So. 990, 992 (1915); Thompson, 142 Ala. at 107, 38 So. at 682 ("Constitutions are made for practical purposes.... [I]f possible, [we are] to give the instrument such construction as will ... make it reasonable rather than absurd."). Accordingly, and unlike Justice See, I see no reason why the term "necessary" may be construed only as meaning either "absolutely necessary" or merely "convenient." 989 So.2d at 1018.
[18] It may be that the filing of tax returns is of the same order of magnitude; however, I suspect that the percentage of this State's residents who have communicated with the State through their applications for driver's licenses is even greater than the percentage of residents who have filed state tax returns.
[19] The beyond-a-reasonable-doubt standard espoused by Justice Smith in her special writing is not an evidentiary standard; rather, according to the Opinion of the Justices No. 1, 209 Ala. 593, 598, 96 So. 487, 493 (1923), cited in Justice Smith's special writing, it is a measure of the degree of certainty by which this Court must be persuaded as to its legal conclusion that the acts or omissions of the legislative or executive branch are inconsistent with the constitution. In this case, I am clear to the legal conclusion  beyond a reasonable doubt  that the actions of State officials are inconsistent with the guidelines and restraints imposed by § 36.01.

Even if a beyond-a-reasonable-doubt evidentiary standard were to be applied, the trial court's summary judgment in favor of the State defendants would still be inappropriate based on the record presented, particularly considering (1) a plain, common-sense reading of the amendment, as discussed above, (2) the fact that, given the nature of the question presented and the fact-finder's ability to apply its common sense and everyday experience in considering that question, a fact-finder reasonably could decide to assign little or no weight to the opinion testimony that has been presented by the State, and (3) the undisputed facts and additional evidence, and the inferences that reasonably may be drawn therefrom, which are discussed below.
[20] All the evidence hereinafter described was submitted to the trial court as attachments to the plaintiffs' motion for summary judgment. Just as the main opinion notes in regard to the single interrogatory answer upon which the State defendants rely, no party objected to or moved to strike any of the evidence described below, and therefore it is part of the record before us for purposes of this appeal.

Based on this evidence (as well as the above-discussed undisputed facts), I cannot conclude, as do Justice See and Justice Smith in their special concurrences, that the plaintiffs have not offered "evidence" that the State defendants' decision (that administering the driver's license test in a language other than English actually helps preserve and enhance English as the common language of this State) is unreasonable. The facts discussed previously and much of the evidence outlined in the following paragraphs of this opinion speak directly to that issue. There is, for example, ample evidence that the decision of State officials to stop administering the test only in English and to begin administering it in other languages was not a reasonable way in which to comply with the constitutional mandate to "take all steps necessary to insure that the role of English as the common language of the State of Alabama is preserved and enhanced." Furthermore, given a "common sense" and "common observation" context for assessing the testimony by the State defendants' witnesses that administering the test in a language other than English would have the effect of preserving and enhancing English as our common language, a fact-finder reasonably could decide to give little or no weight to that testimony.
Moreover, a focus on the supposed lack of evidence of the unreasonableness of the State defendants' position misses the mark. The issue for decision in this case is not whether the State's action represents a reasonable attempt to comply with § 36.01; the issue is whether the State's action actually does comply with § 36.01. There is ample evidence that it does not.
In short, I see no way around the conclusion that the trial court's summary judgment in favor of the State defendants was inappropriate.
[21] This evidence and the evidence of positions taken and statements made by government officials and agencies in paragraphs 2-5 may, as Justice See suggests, inherently reflect interpretations of § 36.01 by those officials and agencies; they also, necessarily, reflect the opinions of those State officials and State agencies as to what is required to fulfill the mandates of § 36.01, including the preservation and enhancement of English as Alabama's common language.